# UNITED STATES DEPARTMENT OF JUSTICE ET AL. *v.* REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS ET AL.

No. 87–1379.   Argued December 7, 1988—Decided March 22, 1989

750

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, MARSHALL, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BLACKMUN, J., filed an opinion concurring in the judgment, in which BRENNAN, J., joined, *post*, p. 780.

*Roy T. Englert, Jr.*, argued the cause for petitioners. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Bolton, Deputy Solicitor General Cohen, Leonard Schaitman,* and *John F. Daly.*

*Kevin T. Baine* argued the cause for respondents. With him on the brief was *Paul Mogin.**

JUSTICE STEVENS delivered the opinion of the Court.

The Federal Bureau of Investigation (FBI) has accumulated and maintains criminal identification records, sometimes referred to as "rap sheets," on over 24 million persons. The question presented by this case is whether the disclosure of the contents of such a file to a third party "could reasonably be expected to constitute an unwarranted invasion of personal privacy" within the meaning of the Freedom of Information Act (FOIA), 5 U. S. C. § 552(b)(7)(C) (1982 ed., Supp. V).

I

In 1924 Congress appropriated funds to enable the Department of Justice (Department) to establish a program to collect and preserve fingerprints and other criminal identification records. 43 Stat. 217. That statute authorized the Department to exchange such information with "officials of States, cities and other institutions." *Ibid.* Six years later Congress created the FBI's identification division, and gave it responsibility for "acquiring, collecting, classifying, and preserving criminal identification and other crime records and the exchanging of said criminal identification records with the duly authorized officials of governmental agencies,

---

*Robert R. Belair* and *Cathy Cravens Snell* filed a brief for Search Group, Inc., et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Newspaper Publishers Association et al. by *Richard J. Ovelmen* and *Laura Besvinick;* for the National Association of Retired Federal Employees by *Joseph B. Scott* and *Michael J. Kator;* and for Public Citizen et al. by *Patti A. Goldman, Alan B. Morrison,* and *Eric R. Glitzenstein.*

Briefs of *amici curiae* were filed for the State of California by *John K. Van de Kamp,* Attorney General, *N. Eugene Hill,* Assistant Attorney General, *Paul H. Dobson,* Supervising Deputy Attorney General, and *Ramon M. de la Guardia,* Deputy Attorney General; and for the American Civil Liberties Union by *John A. Powell.*

of States, cities, and penal institutions." Ch. 455, 46 Stat. 554 (codified at 5 U. S. C. § 340 (1934 ed.)); see 28 U. S. C. § 534(a)(4) (providing for exchange of rap-sheet information among "authorized officials of the Federal Government, the States, cities, and penal and other institutions"). Rap sheets compiled pursuant to such authority contain certain descriptive information, such as date of birth and physical characteristics, as well as a history of arrests, charges, convictions, and incarcerations of the subject. Normally a rap sheet is preserved until its subject attains age 80. Because of the volume of rap sheets, they are sometimes incorrect or incomplete and sometimes contain information about other persons with similar names.

The local, state, and federal law enforcement agencies throughout the Nation that exchange rap-sheet data with the FBI do so on a voluntary basis. The principal use of the information is to assist in the detection and prosecution of offenders; it is also used by courts and corrections officials in connection with sentencing and parole decisions. As a matter of executive policy, the Department has generally treated rap sheets as confidential and, with certain exceptions, has restricted their use to governmental purposes. Consistent with the Department's basic policy of treating these records as confidential, Congress in 1957 amended the basic statute to provide that the FBI's exchange of rap-sheet information with any other agency is subject to cancellation "if dissemination is made outside the receiving departments or related agencies." 71 Stat. 61; see 28 U. S. C. § 534(b).

As a matter of Department policy, the FBI has made two exceptions to its general practice of prohibiting unofficial access to rap sheets. First, it allows the subject of a rap sheet to obtain a copy, see 28 CFR §§ 16.30–16.34 (1988); and second, it occasionally allows rap sheets to be used in the preparation of press releases and publicity designed to assist in the apprehension of wanted persons or fugitives. See § 20.33(a)(4).

In addition, on three separate occasions Congress has expressly authorized the release of rap sheets for other limited purposes. In 1972 it provided for such release to officials of federally chartered or insured banking institutions and "if authorized by State statute and approved by the Attorney General, to officials of State and local governments for purposes of employment and licensing . . . ." 86 Stat. 1115. In 1975, in an amendment to the Securities Exchange Act of 1934, Congress permitted the Attorney General to release rap sheets to self-regulatory organizations in the securities industry. See 15 U. S. C. § 78q(f)(2) (1982 ed., Supp V). And finally, in 1986 Congress authorized release of criminal-history information to licensees or applicants before the Nuclear Regulatory Commission. See 42 U. S. C. § 2169(a). These three targeted enactments—all adopted after the FOIA was passed in 1966—are consistent with the view that Congress understood and did not disapprove the FBI's general policy of treating rap sheets as nonpublic documents.

Although much rap-sheet information is a matter of public record, the availability and dissemination of the actual rap sheet to the public is limited. Arrests, indictments, convictions, and sentences are public events that are usually documented in court records. In addition, if a person's entire criminal history transpired in a single jurisdiction, all of the contents of his or her rap sheet may be available upon request in that jurisdiction. That possibility, however, is present in only three States.[1] All of the other 47 States place substantial restrictions on the availability of criminal-history summaries even though individual events in those summaries are matters of public record. Moreover, even in Florida, Wisconsin, and Oklahoma, the publicly available

---

[1] See Fla. Stat. § 943.053(3) (1987); Wis. Stat. § 19.35 (1987–1988); and Okla. Stat., Tit. 51, § 24A.8 (Supp. 1988).

summaries may not include information about out-of-state arrests or convictions.[2]

## II

The statute known as the FOIA is actually a part of the Administrative Procedure Act (APA). Section 3 of the APA as enacted in 1946 gave agencies broad discretion concerning the publication of governmental records.[3] In 1966 Congress amended that section to implement "'a general philosophy of full agency disclosure.'"[4] The amendment required agencies to publish their rules of procedure in the Federal Register, 5 U. S. C. § 552(a)(1)(C), and to make available for public inspection and copying their opinions, statements of policy, interpretations, and staff manuals and instructions that are not published in the Federal Register, § 552(a)(2). In addition, § 552(a)(3) requires every agency "upon any request for

---

[2] The brief filed on behalf of Search Group, Inc., and other *amici curiae* contains the following summary description of the dissemination policies in 47 States:

"Conviction data, although generally unavailable to the public, is often available to governmental non-criminal justice agencies and even private employers. In general, conviction data is far more available outside the criminal justice system than is nonconviction data. By contrast, in all 47 states nonconviction data cannot be disclosed at all for non-criminal justice purposes, or may be disclosed only in narrowly defined circumstances, for specified purposes." Brief for Search Group, Inc., et al. as *amici curiae* 40 (footnotes omitted); see also Brief for Petitioner 27, n. 13.

A number of States, while requiring disclosure of police blotters and event-based information, deny the public access to personal arrest data such as rap sheets. See *Houston Chronicle Publishing Co.* v. *Houston*, 531 S. W. 2d 177 (Tex. Civ. App. 1975), aff'd, 536 S. W. 2d 559 (Tex. 1976); *Stephens* v. *Van Arsdale*, 227 Kan. 676, 608 P. 2d 972 (1980).

[3] "The section was plagued with vague phrases, such as that exempting from disclosure 'any function of the United States requiring secrecy in the public interest.' Moreover, even 'matters of official record' were only to be made available to 'persons properly and directly concerned' with the information. And the section provided no remedy for wrongful withholding of information." *EPA* v. *Mink*, 410 U. S. 73, 79 (1973).

[4] *Department of Air Force* v. *Rose*, 425 U. S. 352, 360 (1976) (quoting S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965)).

records which . . . reasonably describes such records" to make such records "promptly available to any person."[5]  If an agency improperly withholds any documents, the district court has jurisdiction to order their production.  Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden "on the agency to sustain its action" and directs the district courts to "determine the matter de novo."[6]

Congress exempted nine categories of documents from the FOIA's broad disclosure requirements.  Three of those exemptions are arguably relevant to this case.  Exemption 3 applies to documents that are specifically exempted from disclosure by another statute.  § 552(b)(3).  Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  § 552(b)(6).[7]  Exemption

---

[5] Title 5 U. S. C. § 552(a)(3) provides:

"Except with respect to the records made available under paragraphs (1) and (2) of this subsection, each agency, upon any request for records which (A) reasonably describes such records and (B) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person."

[6] Section 552(a)(4)(B) provides:

"(B) On complaint, the district court . . . has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant.  In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action."

[7] Congress employed similar language earlier in the statute to authorize an agency to delete identifying details that might otherwise offend an individual's privacy:

"To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, or staff manual or instruction."  § 552(a)(2).

7(C) excludes records or information compiled for law enforcement purposes, "but only to the extent that the production of such [materials] . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." § 552(b)(7)(C).

Exemption 7(C)'s privacy language is broader than the comparable language in Exemption 6 in two respects. First, whereas Exemption 6 requires that the invasion of privacy be "clearly unwarranted," the adverb "clearly" is omitted from Exemption 7(C). This omission is the product of a 1974 amendment adopted in response to concerns expressed by the President.[8] Second, whereas Exemption 6 refers to disclosures that "would constitute" an invasion of privacy, Exemption 7(C) encompasses any disclosure that "could reasonably be expected to constitute" such an invasion. This difference is also the product of a specific amendment.[9] Thus, the standard for evaluating a threatened invasion of privacy interests resulting from the disclosure of records compiled for law enforcement purposes is somewhat broader than the standard applicable to personnel, medical, and similar files.

---

[8] See 120 Cong. Rec. 33158–33159 and 34162–34163 (1974).

[9] See 132 Cong. Rec. 27189 and 31414–31415 (1986). Although the move from the "would constitute" standard to the "could reasonably be expected to constitute" standard represents a considered congressional effort "to ease considerably a Federal law enforcement agency's burden in invoking [Exemption 7]," id., at 31424, there is no indication that the shift was intended to eliminate de novo review in favor of agency deference in Exemption 7(C) cases. Rather, although district courts still operate under the general de novo review standard of 5 U. S. C. § 552(a)(4)(B), in determining the impact on personal privacy from disclosure of law enforcement records or information, the stricter standard of whether such disclosure "would" constitute an unwarranted invasion of such privacy gives way to the more flexible standard of whether such disclosure "could reasonably be expected to" constitute such an invasion.

### III

This case arises out of requests made by a CBS news correspondent and the Reporters Committee for Freedom of the Press (respondents) for information concerning the criminal records of four members of the Medico family. The Pennsylvania Crime Commission had identified the family's company, Medico Industries, as a legitimate business dominated by organized crime figures. Moreover, the company allegedly had obtained a number of defense contracts as a result of an improper arrangement with a corrupt Congressman.

The FOIA requests sought disclosure of any arrests, indictments, acquittals, convictions, and sentences of any of the four Medicos. Although the FBI originally denied the requests, it provided the requested data concerning three of the Medicos after their deaths. In their complaint in the District Court, respondents sought the rap sheet for the fourth, Charles Medico (Medico), insofar as it contained "matters of public record." App. 33.

The parties filed cross-motions for summary judgment. Respondents urged that any information regarding "a record of bribery, embezzlement or other financial crime" would potentially be a matter of special public interest. *Id.*, at 97. In answer to that argument, the Department advised respondents and the District Court that it had no record of any financial crimes concerning Medico, but the Department continued to refuse to confirm or deny whether it had any information concerning nonfinancial crimes. Thus, the issue was narrowed to Medico's nonfinancial-crime history insofar as it is a matter of public record.

The District Court granted the Department's motion for summary judgment, relying on three separate grounds. First, it concluded that 28 U. S. C. § 534, the statute that authorizes the exchange of rap-sheet information with other official agencies, also prohibits the release of such information to members of the public, and therefore that Exemption 3

was applicable.[10]   Second, it decided that files containing rap sheets were included within the category of "personnel and medical files and similar files the disclosure of which would constitute an unwarranted invasion of privacy," and therefore that Exemption 6 was applicable.   The term "similar files" applied because rap-sheet information "is personal to the individual named therein."   App. to Pet. for Cert. 56a. After balancing Medico's privacy interest against the public interest in disclosure, the District Court concluded that the invasion of privacy was "clearly unwarranted."[11]   Finally, the court held that the rap sheet was also protected by Ex-

---

[10] "The duty to compile such records is set forth in 28 U. S. C. § 534. That section provides that the Attorney General is to 'acquire, collect, classify, and preserve identification, criminal identification, crime and other records' and that he is to 'exchange these records with, and for the official use of, authorized officials of the Federal Government, the States, cities, and penal and other institutions.'   Significantly, however, the section goes on to provide that '[t]he exchange of records authorized by [the section] is subject to cancellation if dissemination is made outside the receiving departments or related agencies.'   Section 534(b).

"This Court is satisfied that pursuant to the above section, the information acquired and collected by the Attorney General may be released only to the agencies, organizations or states set forth in that section, and may not be released to the general public.   Thus, the information is '[s]pecifically exempted from disclosure by statute [28 U. S. C. § 534]' which 'requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue.'   The Court therefore concludes that if the defendants have collected and maintained a rap sheet related to Charles Medico, that rap sheet is exempt from disclosure pursuant to Exemption 3."   App. to Pet. for Cert. 55a.

[11] "It seems highly unlikely that information about offenses which may have occurred 30 or 40 years ago, as in the case of William Medico, would have any relevance or public interest.   The same can be said for information relating to the arrest or conviction of persons for minor criminal offenses or offenses which are completely unrelated to anything now under consideration by the plaintiffs.   That information is personal to the third party (Charles Medico), and it if [sic] exists, its release would constitute 'a clearly unwarranted invasion of personal privacy.'   The Court concludes therefore that those documents and that information are exempt from disclosure pursuant to 5 U. S. C. § 552(b)(6) and (7)(C)."   Id., at 57a.

emption 7(C), but it ordered the Department to file a statement containing the requested data *in camera* to give it an opportunity to reconsider the issue if, after reviewing that statement, such action seemed appropriate. After the Department made that filing, the District Court advised the parties that it would not reconsider the matter, but it did seal the *in camera* submission and make it part of the record on appeal.

The Court of Appeals reversed. 259 U. S. App. D. C. 426, 816 F. 2d 730 (1987). It held that an individual's privacy interest in criminal-history information that is a matter of public record was minimal at best. Noting the absence of any statutory standards by which to judge the public interest in disclosure, the Court of Appeals concluded that it should be bound by the state and local determinations that such information should be made available to the general public. Accordingly, it held that Exemptions 6 and 7(C) were inapplicable. It also agreed with respondents that Exemption 3 did not apply because 28 U. S. C. § 534 did not qualify as a statute "specifically" exempting rap sheets from disclosure.

In response to rehearing petitions advising the court that, contrary to its original understanding, most States had adopted policies of refusing to provide members of the public with criminal-history summaries, the Court of Appeals modified its holding. 265 U. S. App. D. C. 365, 831 F. 2d 1124 (1987). With regard to the public interest side of the balance, the court now recognized that it could not rely upon state policies of disclosure. However, it adhered to its view that federal judges are not in a position to make "idiosyncratic" evaluations of the public interest in particular disclosures, see 259 U. S. App. D. C., at 437, 816 F. 2d, at 741; instead, it directed district courts to consider "the general disclosure policies of the statute." 265 U. S. App. D. C., at 367, 831 F. 2d, at 1126. With regard to the privacy interest in nondisclosure of rap sheets, the court told the District Court "only to make a factual determination in these kinds of

cases: Has a legitimate privacy interest of the subject in his rap sheets faded because they appear on the public record?" *Id.*, at 368, 831 F. 2d, at 1127. In accordance with its initial opinion, it remanded the case to the District Court to determine whether the withheld information is publicly available at its source, and if so, whether the Department might satisfy its statutory obligation by referring respondents to the enforcement agency or agencies that had provided the original information.

Although he had concurred in the Court of Appeals' original disposition, Judge Starr dissented, expressing disagreement with the majority on three points. First, he rejected the argument that there is no privacy interest in "cumulative, indexed, computerized" data simply because the underlying information is on record at local courthouses or police stations:

> "As I see it, computerized data banks of the sort involved here present issues considerably more difficult than, and certainly very different from, a case involving the source records themselves. This conclusion is buttressed by what I now know to be the host of state laws requiring that cumulative, indexed criminal history information be kept confidential, as well as by general Congressional indications of concern about the privacy implications of computerized data banks. *See* H. R. Rep. No. 1416, 93d Cong., 2d Sess. 3, 6–9 (1974), *reprinted in Legislative History of the Privacy Act of 1974, Source Book on Privacy*, 296, 299–302 (1974)." *Id.*, at 369, 831 F. 2d, at 1128.

Second, Judge Starr concluded that the statute required the District Court to make a separate evaluation of the public interest in disclosure depending upon the kind of use that would be made of the information and the identity of the subject:

"Although there may be no public interest in disclosure of the FBI rap sheet of one's otherwise inconspicuously anonymous next-door neighbor, there may be a significant public interest—one that overcomes the substantial privacy interest at stake—in the rap sheet of a public figure or an official holding high governmental office. For guidance in fleshing out that analysis, it seems sensible to me to draw upon the substantial body of defamation law dealing with 'public personages.'" *Id.*, at 370, 831 F. 2d, at 1129.

Finally, he questioned the feasibility of requiring the Department to determine the availability of the requested material at its source, and expressed concern that the majority's approach departed from the original purpose of the FOIA and threatened to convert the Federal Government into a clearinghouse for personal information that had been collected about millions of persons under a variety of different situations:

"We are now informed that many federal agencies collect items of information on individuals that are ostensibly matters of public record. For example, Veterans Administration and Social Security records include birth certificates, marriage licenses, and divorce decrees (which may recite findings of fault); the Department of Housing and Urban Development maintains data on millions of home mortgages that are presumably 'public records' at county clerks' offices. . . . Under the majority's approach, in the absence of state confidentiality laws, there would appear to be a virtual per se rule requiring all such information to be released. The federal government is thereby transformed in one fell swoop into *the* clearinghouse for highly personal information, releasing records on any person, to any requester, for any purpose. This Congress did not intend." *Id.*, at 371, 831 F. 2d, at 1130 (emphasis in original).

The Court of Appeals denied rehearing en banc, with four judges dissenting. App. to Pet. for Cert. 64a–66a. Because of the potential effect of the Court of Appeals' opinion on values of personal privacy, we granted certiorari. 485 U. S. 1005 (1988). We now reverse.[12]

## IV

Exemption 7(C) requires us to balance the privacy interest in maintaining, as the Government puts it, the "practical obscurity" of the rap sheets against the public interest in their release.

The preliminary question is whether Medico's interest in the nondisclosure of any rap sheet the FBI might have on him is the sort of "personal privacy" interest that Congress intended Exemption 7(C) to protect.[13] As we have pointed out before, "[t]he cases sometimes characterized as protecting 'privacy' have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen* v. *Roe*, 429 U. S. 589, 598–600 (1977) (footnotes omitted). Here, the former interest, "in avoiding disclosure of personal matters," is implicated. Because events summarized in a rap sheet have been previously disclosed to the public, respondents contend that Medico's privacy interest in avoiding disclosure of a federal compilation of these events

---

[12] Because Exemption 7(C) covers this case, there is no occasion to address the application of Exemption 6.

[13] The question of the statutory meaning of privacy under the FOIA is, of course, not the same as the question whether a tort action might lie for invasion of privacy or the question whether an individual's interest in privacy is protected by the Constitution. See, *e. g.*, *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975) (Constitution prohibits State from penalizing publication of name of deceased rape victim obtained from public records); *Paul* v. *Davis*, 424 U. S. 693, 712–714 (1976) (no constitutional privacy right affected by publication of name of arrested but untried shoplifter).

approaches zero.    We reject respondents' cramped notion of personal privacy.

To begin with, both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.    In an organized society, there are few facts that are not at one time or another divulged to another.[14]    Thus the extent of the protection accorded a privacy right at common law rested in part on the degree of dissemination of the allegedly private fact and the extent to which the passage of time rendered it private.[15]    According to Webster's initial definition, information may be classified as "private" if it is "intended for or restricted to

[14] See Karst, "The Files": Legal Controls Over the Accuracy and Accessibility of Stored Personal Data, 31 Law & Contemp. Prob. 342, 343–344 (1966) ("Hardly anyone in our society can keep altogether secret very many facts about himself.    Almost every such fact, however personal or sensitive, is known to someone else.    Meaningful discussion of privacy, therefore, requires the recognition that ordinarily we deal not with an interest in total nondisclosure but with an interest in selective disclosure").

[15] See Warren & Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193, 198 (1890–1891) ("The common law secures to each individual the right of determining, ordinarily, to what extent his thoughts, sentiments, and emotions shall be communicated to others. . . . [E]ven if he has chosen to give them expression, he generally retains the power to fix the limits of the publicity which shall be given them").    The common law recognized that one did not necessarily forfeit a privacy interest in matters made part of the public record, albeit the privacy interest was diminished and another who obtained the facts from the public record might be privileged to publish it.    See *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S., at 494–495 ("[T]he interests in privacy *fade* when the information involved already appears on the public record") (emphasis supplied).    See also Restatement (Second) of Torts § 652D, pp. 385–386 (1977) ("[T]here is no liability for giving publicity to facts about the plaintiff's life that are matters of public record, such as the date of his birth . . . .    On the other hand, if the record is one not open to public inspection, as in the case of income tax returns, it is not public and there is an invasion of privacy when it is made so"); W. Keeton, D. Dobbs, R. Keeton, & D. Owens, Prosser & Keeton on Law of Torts § 117, p. 859 (5th ed. 1984) ("[M]erely because [a fact] can be found in a public recor[d] does not mean that it should receive widespread publicity if it does not involve a matter of public concern").

the use of a particular person or group or class of persons: not freely available to the public." [16]    Recognition of this attribute of a privacy interest supports the distinction, in terms of personal privacy, between scattered disclosure of the bits of information contained in a rap sheet and revelation of the rap sheet as a whole.   The very fact that federal funds have been spent to prepare, index, and maintain these criminal-history files demonstrates that the individual items of information in the summaries would not otherwise be "freely available" either to the officials who have access to the underlying files or to the general public.   Indeed, if the summaries were "freely available," there would be no reason to invoke the FOIA to obtain access to the information they contain.   Granted, in many contexts the fact that information is not freely available is no reason to exempt that information from a statute generally requiring its dissemination.   But the issue here is whether the compilation of otherwise hard-to-obtain information alters the privacy interest implicated by disclosure of that information.   Plainly there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information.

This conclusion is supported by the web of federal statutory and regulatory provisions that limits the disclosure of

---

[16] See Webster's Third New International Dictionary 1804 (1976).   See also A. Breckenridge, The Right to Privacy 1 (1970) ("Privacy, in my view, is the rightful claim of the individual to determine the extent to which he wishes to share of himself with others. . . . It is also the individual's right to control dissemination of information about himself"); A. Westin, Privacy and Freedom 7 (1967) ("Privacy is the claim of individuals . . . to determine for themselves when, how, and to what extent information about them is communicated to others"); Project, Government Information and the Rights of Citizens, 73 Mich. L. Rev. 971, 1225 (1974–1975) ("[T]he right of privacy is the right to control the flow of information concerning the details of one's individuality").

rap-sheet information. That is, Congress has authorized rap-sheet dissemination to banks, local licensing officials, the securities industry, the nuclear-power industry, and other law enforcement agencies. See *supra*, at 752–753. Further, the FBI has permitted such disclosure to the subject of the rap sheet and, more generally, to assist in the apprehension of wanted persons or fugitives. See *supra*, at 752. Finally, the FBI's exchange of rap-sheet information "is subject to cancellation if dissemination is made outside the receiving departments or related agencies." 28 U. S. C. § 534(b). This careful and limited pattern of authorized rap-sheet disclosure fits the dictionary definition of privacy as involving a restriction of information "to the use of a particular person or group or class of persons." Moreover, although perhaps not specific enough to constitute a statutory exemption under FOIA Exemption 3, 5 U. S. C. § 552(b)(3),[17] these statutes and regulations, taken as a whole, evidence a congressional intent to protect the privacy of rap-sheet subjects, and a concomitant recognition of the power of compilations to affect personal privacy that outstrips the combined power of the bits of information contained within.

Other portions of the FOIA itself bolster the conclusion that disclosure of records regarding private citizens, identifiable by name, is not what the framers of the FOIA had in mind. Specifically, the FOIA provides that "[t]o the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, or staff manual or instruction." 5 U. S. C. § 552(a)(2). Additionally, the FOIA assures that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under [§ (b)]." 5 U. S. C.

---

[17] The Court of Appeals reversed the District Court's holding in favor of petitioners on the Exemption 3 issue, and petitioners do not renew their Exemption 3 argument before this Court. See Pet. for Cert. 6, n. 1.

§ 552(b) (1982 ed., Supp. V). These provisions, for deletion of identifying references and disclosure of segregable portions of records with exempt information deleted, reflect a congressional understanding that disclosure of records containing personal details about private citizens can infringe significant privacy interests.[18]

Also supporting our conclusion that a strong privacy interest inheres in the nondisclosure of compiled computerized information is the Privacy Act of 1974, codified at 5 U. S. C. § 552a (1982 ed. and Supp. V). The Privacy Act was passed largely out of concern over "the impact of computer data banks on individual privacy." H. R. Rep. No. 93–1416, p. 7 (1974). The Privacy Act provides generally that "[n]o agency shall disclose any record which is contained in a system of records . . . except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U. S. C. § 552a(b) (1982 ed., Supp. V). Although the Privacy Act contains a variety of excep-

---

[18] See S. Rep. No. 813, 89th Cong., 1st Sess., 7 (1965) ("The authority to delete identifying details after written justification is necessary in order to be able to balance the public's right to know with the private citizen's right to be secure in his personal affairs which have no bearing or effect on the general public. For example, it may be pertinent to know that unseasonably harsh weather has caused an increase in public relief costs; but it is not necessary that the identity of any person so affected be made public"); H. R. Rep. No. 1497, 89th Cong., 2d Sess., 8 (1966) ("The public has a need to know, for example, the details of an agency opinion or statement of policy on an income tax matter, but there is no need to identify the individuals involved in a tax matter if the identification has no bearing or effect on the general public"). Both public relief and income tax assessments—like law enforcement—are proper subjects of public concern. But just as the identity of the individuals given public relief or involved in tax matters is irrelevant to the public's understanding of the Government's operation, so too is the identity of individuals who are the subjects of rap sheets irrelevant to the public's understanding of the system of law enforcement. For rap sheets reveal only the dry, chronological, personal history of individuals who have had brushes with the law, and tell us nothing about matters of substantive law enforcement policy that are properly the subject of public concern.

tions to this rule, including an exemption for information required to be disclosed under the FOIA, see 5 U. S. C. § 552a(b)(2), Congress' basic policy concern regarding the implications of computerized data banks for personal privacy is certainly relevant in our consideration of the privacy interest affected by dissemination of rap sheets from the FBI computer.

Given this level of federal concern over centralized data bases, the fact that most States deny the general public access to their criminal-history summaries should not be surprising. As we have pointed out, see *supra*, at 753, and n. 2, in 47 States nonconviction data from criminal-history summaries are not available at all, and even conviction data are "generally unavailable to the public." See n. 2, *supra*. State policies, of course, do not determine the meaning of a federal statute, but they provide evidence that the law enforcement profession generally assumes—as has the Department of Justice—that individual subjects have a significant privacy interest in their criminal histories. It is reasonable to presume that Congress legislated with an understanding of this professional point of view.

In addition to the common-law and dictionary understandings, the basic difference between scattered bits of criminal history and a federal compilation, federal statutory provisions, and state policies, our cases have also recognized the privacy interest inherent in the nondisclosure of certain information even where the information may have been at one time public. Most apposite for present purposes is our decision in *Department of Air Force* v. *Rose*, 425 U. S. 352 (1976). New York University law students sought Air Force Academy Honor and Ethics Code case summaries for a law review project on military discipline. The Academy had already publicly posted these summaries on 40 squadron bulletin boards, usually with identifying names redacted (names were posted for cadets who were found guilty and who left the Academy), and with instructions that cadets should read

the summaries only if necessary. Although the opinion dealt with Exemption 6's exception for "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," and our opinion today deals with Exemption 7(C), much of our discussion in *Rose* is applicable here. We explained that the FOIA permits release of a segregable portion of a record with other portions deleted, and that *in camera* inspection was proper to determine whether parts of a record could be released while keeping other parts secret. See *id.*, at 373–377; 5 U. S. C. §§ 552(b) and (a)(4)(B) (1982 ed. and Supp. V). We emphasized the FOIA's segregability and *in camera* provisions in order to explain that the case summaries, *with identifying names redacted*, were generally disclosable. We then offered guidance to lower courts in determining whether disclosure of all or part of such case summaries would constitute a "clearly unwarranted invasion of personal privacy" under Exemption 6:

> "Respondents sought only such disclosure as was consistent with [the Academy tradition of keeping identities confidential within the Academy]. Their request for access to summaries 'with personal references or other identifying information deleted,' respected the confidentiality interests embodied in Exemption 6. As the Court of Appeals recognized, however, what constitutes identifying information regarding a subject cadet must be weighed not only from the viewpoint of the public, but also from the vantage of those who would have been familiar, as fellow cadets or Academy staff, with other aspects of his career at the Academy. Despite the summaries' distribution within the Academy, many of this group with earlier access to summaries may never have identified a particular cadet, or may have wholly forgotten his encounter with Academy discipline. And the risk to the privacy interests of a former cadet, particularly one who has remained in the military, posed by his

identification by otherwise unknowing former colleagues or instructors cannot be rejected as trivial. We nevertheless conclude that consideration of the policies underlying the Freedom of Information Act, to open public business to public view when no 'clearly unwarranted' invasion of privacy will result, requires affirmance of the holding of the Court of Appeals . . . that although 'no one can guarantee that all those who are "in the know" will hold their tongues, particularly years later when time may have eroded the fabric of cadet loyalty,' it sufficed to protect privacy at this stage in these proceedings by enjoining the District Court . . . that if in its opinion deletion of personal references and other identifying information 'is not sufficient to safeguard privacy, then the summaries should not be disclosed to [respondents].'" 425 U. S., at 380–381.

See also *id.*, at 387–388 (BLACKMUN, J., dissenting); *id.*, at 389–390 (REHNQUIST, J., dissenting). In this passage we doubly stressed the importance of the privacy interest implicated by disclosure of the case summaries. First: We praised the Academy's tradition of protecting personal privacy through redaction of names from the case summaries. But even with names redacted, subjects of such summaries can often be identified through other, disclosed information. So, second: *Even though the summaries, with only names redacted, had once been public*, we recognized the potential invasion of privacy through later recognition of identifying details, and approved the Court of Appeals' rule permitting the District Court to delete "other identifying information" in order to safeguard this privacy interest. If a cadet has a privacy interest in past discipline that was once public but may have been "wholly forgotten," the ordinary citizen surely has a similar interest in the aspects of his or her criminal history that may have been wholly forgotten.

We have also recognized the privacy interest in keeping personal facts away from the public eye. In *Whalen* v. *Roe*,

429 U. S. 589 (1977), we held that "the State of New York may record, in a centralized computer file, the names and addresses of all persons who have obtained, pursuant to a doctor's prescription, certain drugs for which there is both a lawful and an unlawful market." *Id.*, at 591. In holding only that the Federal Constitution does not *prohibit* such a compilation, we recognized that such a centralized computer file posed a "threat to privacy":

> "We are not unaware of the threat to privacy implicit in the accumulation of vast amounts of personal information in computerized data banks or other massive government files. The collection of taxes, the distribution of welfare and social security benefits, the supervision of public health, the direction of our Armed Forces, and the enforcement of the criminal laws all require the orderly preservation of great quantities of information, much of which is personal in character and potentially embarrassing or harmful if disclosed. The right to collect and use such data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures. Recognizing that in some circumstances that duty arguably has its roots in the Constitution, nevertheless New York's statutory scheme, and its implementing administrative procedures, evidence a proper concern with, and protection of, the individual's interest in privacy." *Id.*, at 605 (footnote omitted); see also *id.*, at 607 (BRENNAN, J., concurring) ("The central storage and easy accessibility of computerized data vastly increase the potential for abuse of that information . . .").

In sum, the fact that "an event is not wholly 'private' does not mean that an individual has no interest in limiting disclosure or dissemination of the information." Rehnquist, Is an Expanded Right of Privacy Consistent with Fair and Effective Law Enforcement?, Nelson Timothy Stephens Lectures, University of Kansas Law School, pt. 1, p. 13 (Sept. 26–27,

1974). The privacy interest in a rap sheet is substantial. The substantial character of that interest is affected by the fact that in today's society the computer can accumulate and store information that would otherwise have surely been forgotten long before a person attains age 80, when the FBI's rap sheets are discarded.

V

Exemption 7(C), by its terms, permits an agency to withhold a document only when revelation "could reasonably be expected to constitute an *unwarranted* invasion of personal privacy." We must next address what factors might *warrant* an invasion of the interest described in Part IV, *supra*.

Our previous decisions establish that whether an invasion of privacy is *warranted* cannot turn on the purposes for which the request for information is made. Except for cases in which the objection to disclosure is based on a claim of privilege and the person requesting disclosure is the party protected by the privilege, the identity of the requesting party has no bearing on the merits of his or her FOIA request. Thus, although the subject of a presentence report can waive a privilege that might defeat a third party's access to that report, *United States Department of Justice* v. *Julian*, 486 U. S. 1, 13–14 (1988), and although the FBI's policy of granting the subject of a rap sheet access to his own criminal history is consistent with its policy of denying access to all other members of the general public, see *supra*, at 752, the rights of the two press respondents in this case are no different from those that might be asserted by any other third party, such as a neighbor or prospective employer. As we have repeatedly stated, Congress "clearly intended" the FOIA "to give any member of the public as much right to disclosure as one with a special interest [in a particular document]." *NLRB* v. *Sears, Roebuck & Co.*, 421 U. S. 132, 149 (1975); see *NLRB* v. *Robbins Tire & Rubber Co.*, 437 U. S. 214, 221 (1978); *FBI* v. *Abramson*, 456 U. S. 615 (1982). As Profes-

sor Davis explained: "The Act's sole concern is with what must be made public or not made public."[19]

Thus whether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to "the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.'" *Department of Air Force* v. *Rose*, 425 U. S., at 372, rather than on the particular purpose for which the document is being requested. In our leading case on the FOIA, we declared that the Act was designed to create a broad right of access to "official information." *EPA* v. *Mink*, 410 U. S. 73, 80 (1973).[20] In his dissent in that case, Justice Douglas characterized the philosophy of the statute by quoting this comment by Henry Steele Commager:

> "'The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed itself to the principle that a democracy cannot function unless the people are permitted

---

[19] Davis, The Information Act: A Preliminary Analysis, 34 U. Chi. L. Rev. 761, 765 (1966–1967), quoted in JUSTICE SCALIA's dissenting opinion in *United States Department of Justice* v. *Julian*, 486 U. S. 1, 17 (1988).

[20] Cf. Easterbrook, Privacy and the Optimal Extent of Disclosure Under the Freedom of Information Act, 9 J. Legal Studies 775, 777 (1980) ("The act's indexing and reading-room rules indicate that the primary objective is the elimination of 'secret law.' Under the FOIA an agency must disclose its rules governing relationships with private parties and its demands on private conduct"); Kronman, The Privacy Exemption to the Freedom of Information Act, 9 J. Legal Studies 727, 733 (1980) ("The act's first and most obvious goal (reflected in its basic disclosure requirements) is to promote honesty and reduce waste in government by exposing official conduct to public scrutiny"); Comment, The Freedom of Information Act's Privacy Exemption and the Privacy Act of 1974, 11 Harv. Civ. Rights–Civ. Lib. L. Rev. 596, 608 (1976) ("No statement was made in Congress that the Act was designed for a broader purpose such as making the government's collection of data available to anyone who has any socially useful purpose for it. For example, it was never suggested that the FOIA would be a boon to academic researchers, by eliminating their need to assemble on their own data which the government has already collected").

to know *what their government is up to.'"* *Id.*, at 105 (quoting from The New York Review of Books, Oct. 5, 1972, p. 7) (emphasis added).

This basic policy of "'full agency disclosure unless information is exempted under clearly delineated statutory language,'" *Department of Air Force* v. *Rose*, 425 U. S., at 360–361 (quoting S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965)), indeed focuses on the citizens' right to be informed about "what their government is up to." Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose. That purpose, however, is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct. In this case—and presumably in the typical case in which one private citizen is seeking information about another—the requester does not intend to discover anything about the conduct of the agency that has possession of the requested records. Indeed, response to this request would not shed any light on the conduct of any Government agency or official.

The point is illustrated by our decision in *Rose, supra.* As discussed earlier, we held that the FOIA required the United States Air Force to honor a request for *in camera* submission of disciplinary-hearing summaries maintained in the Academy's Honors and Ethics Code reading files. The summaries obviously contained information that would explain how the disciplinary procedures actually functioned and therefore were an appropriate subject of a FOIA request. All parties, however, agreed that the files should be redacted by deleting information that would identify the particular cadets to whom the summaries related. The deletions were unquestionably appropriate because the names of the particular cadets were irrelevant to the inquiry into the way the Air Force Academy administered its Honor Code; leaving the identifying material in the summaries would therefore have been a "clearly un-

warranted" invasion of individual privacy. If, instead of seeking information about the Academy's own conduct, the requests had asked for specific files to obtain information about the persons to whom those files related, the public interest that supported the decision in *Rose* would have been inapplicable. In fact, we explicitly recognized that "the basic purpose of the [FOIA is] to open agency action to the light of public scrutiny." *Id.*, at 372.

Respondents argue that there is a twofold public interest in learning about Medico's past arrests or convictions: He allegedly had improper dealings with a corrupt Congressman, and he is an officer of a corporation with defense contracts. But if Medico has, in fact, been arrested or convicted of certain crimes, that information would neither aggravate nor mitigate his allegedly improper relationship with the Congressman; more specifically, it would tell us nothing directly about the character of the *Congressman's* behavior. Nor would it tell us anything about the conduct of the *Department of Defense* (DOD) in awarding one or more contracts to the Medico Company. Arguably a FOIA request to the DOD for records relating to those contracts, or for documents describing the agency's procedures, if any, for determining whether officers of a prospective contractor have criminal records, would constitute an appropriate request for "official information." Conceivably Medico's rap sheet would provide details to include in a news story, but, in itself, this is not the kind of public interest for which Congress enacted the FOIA. In other words, although there is undoubtedly some public interest in anyone's criminal history, especially if the history is in some way related to the subject's dealing with a public official or agency, the FOIA's central purpose is to ensure that the *Government's* activities be opened to the sharp eye of public scrutiny, not that information about *private citizens* that happens to be in the warehouse of the Government be so disclosed. Thus, it should come as no surprise that in none of our cases construing the FOIA have we found it appropri-

ate to order a Government agency to honor a FOIA request for information about a particular private citizen.[21]

What we have said should make clear that the public interest in the release of any rap sheet on Medico that may exist is not the type of interest protected by the FOIA. Medico may or may not be one of the 24 million persons for whom the FBI has a rap sheet. If respondents are entitled to have the FBI tell them what it knows about Medico's criminal history, any other member of the public is entitled to the same disclosure—whether for writing a news story, for deciding whether to employ Medico, to rent a house to him, to extend credit to him, or simply to confirm or deny a suspicion. There is, unquestionably, *some* public interest in providing interested citizens with answers to their questions about Medico. But that interest falls outside the ambit of the public interest that the FOIA was enacted to serve.

Finally, we note that Congress has provided that the standard fees for production of documents under the FOIA shall be waived or reduced "if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U. S. C. § 552(a)(4)(A)(iii) (1982 ed., Supp. V). Although such a provision obviously implies that there will be requests that do not meet such a "public interest" standard, we think it relevant to today's inquiry regarding the public interest in release of rap sheets on private citizens that Congress once again expressed the core purpose of the FOIA as "contribut[ing] significantly to public understanding *of the operations or activities of the government.*"

---

[21] In fact, in at least three cases we have specifically *rejected* requests for information about private citizens. See *CIA* v. *Sims*, 471 U. S. 159 (1985); *FBI* v. *Abramson*, 456 U. S. 615 (1982); *United States Department of State* v. *Washington Post Co.*, 456 U. S. 595 (1982).

## VI

Both the general requirement that a court "shall determine the matter de novo" and the specific reference to an "unwarranted" invasion of privacy in Exemption 7(C) indicate that a court must balance the public interest in disclosure against the interest Congress intended the Exemption to protect. Although both sides agree that such a balance must be undertaken, *how* such a balance should be done is in dispute. The Court of Appeals majority expressed concern about assigning federal judges the task of striking a proper case-by-case, or ad hoc, balance between individual privacy interests and the public interest in the disclosure of criminal-history information without providing those judges standards to assist in performing that task. Our cases provide support for the proposition that categorical decisions may be appropriate and individual circumstances disregarded when a case fits into a genus in which the balance characteristically tips in one direction. The point is well illustrated by both the majority and dissenting opinions in *NLRB* v. *Robbins Tire & Rubber Co.*, 437 U. S. 214 (1978).

In *Robbins*, the majority held that Exemption 7(A), which protects from disclosure law enforcement records or information that "could reasonably be expected to interfere with enforcement proceedings," applied to statements of witnesses whom the National Labor Relations Board (NLRB or Board) intended to call at an unfair-labor-practice hearing. Although we noted that the language of Exemptions 7(B), (C), and (D) seems to contemplate a case-by-case showing "that the factors made relevant by the statute are present in each distinct situation," *id.*, at 223; see *id.*, at 234, we concluded that Exemption 7(A) "appears to contemplate that certain generic determinations might be made." *Id.*, at 224. Thus, our ruling encompassed the entire category of NLRB witness statements, and a concurring opinion pointed out that the category embraced enforcement proceedings by other agen-

cies as well. See *id.*, at 243 (STEVENS, J., concurring). In his partial dissent, Justice Powell endorsed the Court's "generic" approach to the issue, *id.*, at 244; he agreed that "the congressional requirement of a specific showing of harm does not prevent determinations of likely harm with respect to prehearing release of particular categories of documents." *Id.*, at 249. In his view, however, the exempt category should have been limited to statements of witnesses who were currently employed by the respondent. To be sure, the majority opinion in *Robbins* noted that the phrases "'a person,'" "'an unwarranted invasion,'" and "'a confidential source,'" in Exemptions 7(B), (C), and (D), respectively, seem to imply a need for an individualized showing in every case (whereas the plural "'enforcement proceedings'" in Exemption 7(A) implies a cátegorical determination). See *id.*, at 223–224. But since only an Exemption 7(A) question was presented in *Robbins*, we conclude today, upon closer inspection of Exemption 7(C), that for an appropriate class of law enforcement records or information a categorical balance may be undertaken there as well.[22]

---

[22] Our willingness to permit categorical balancing in *Robbins* itself was a departure from earlier dicta. In *NLRB* v. *Sears, Roebuck & Co.*, 421 U. S. 132, 162–165 (1975), we decided not to decide an Exemption 7 issue. In so doing, we responded to the NLRB General Counsel's argument that "once a certain *type* of document is determined to fall into the category of 'investigatory files' the courts are not to inquire whether the disclosure of the *particular* document in question would contravene any of the purposes of Exemption 7." *Id.*, at 163 (emphases in original). In other words, the General Counsel argued for categorical balancing throughout Exemption 7. We rejected this argument: "The legislative history clearly indicates that Congress disapproves of those cases, relied on by the General Counsel, . . . which relieve the Government of the obligation to show that disclosure of a particular investigatory file would contravene the purposes of Exemption 7." *Id.*, at 164. The legislative history cited, S. Conf. Rep. No. 93–1200 (1974), is in fact not clear on the question whether categorical balancing may be appropriate in Exemption 7 or elsewhere. In 1986, moreover, Congress amended Exemption 7(C) to give the Government greater flexibility in responding to FOIA requests for law enforcement records or in-

First: A separate discussion in *Robbins* applies properly to Exemption 7(C) as well as to Exemption 7(A). Respondent had argued that "because FOIA expressly provides for disclosure of segregable portions of records and for *in camera* review of documents, and because the statute places the burden of justifying nondisclosure on the Government, 5 U. S. C. §§ 552(a)(4)(B), (b) (1976 ed.), the Act necessarily contemplates that the Board must specifically demonstrate in each case that disclosure of the particular witness' statement would interfere with a pending enforcement proceeding." 437 U. S., at 224. We rejected this argument, holding instead that these provisions could equally well apply to categorical balancing. This holding—that the provisions regarding segregability, *in camera* inspections, and burden of proof do not by themselves mandate case-by-case balancing—is a general one that applies to all exemptions.

Second: Although *Robbins* noted that Exemption 7(C) speaks of "*an* unwarranted invasion of personal privacy" (emphasis added), we do not think that the Exemption's use of the singular mandates ad hoc balancing. The Exemption in full provides: "This section does not apply to matters that are—records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of per-

---

formation. Whereas previously the Government was required to show that disclosure of a law enforcement record "would" constitute an unwarranted invasion of personal privacy, under amended Exemption 7(C) the Government need only establish that production "could reasonably be expected" to cause such an invasion. The amendment was originally proposed by the Senate which intended to replace a focus on the effect of a particular disclosure "with a standard of reasonableness . . . based on an objective test." S. Rep. No. 98–221, p. 24 (1983). This reasonableness standard, focusing on whether disclosure of a particular type of document would tend to cause an unwarranted invasion of privacy, amply supports a categorical approach to the balance of private and public interests in Exemption 7(C).

sonal privacy." Just as one can ask whether a particular rap sheet is a "law enforcement record" that meets the requirements of this Exemption, so too can one ask whether rap sheets in general (or at least on private citizens) are "law enforcement records" that meet the stated criteria. If it is always true that the damage to a private citizen's privacy interest from a rap sheet's production outweighs the FOIA-based public value of such disclosure, then it is perfectly appropriate to conclude as a categorical matter that "production of such [rap sheets] could reasonably be expected to constitute an unwarranted invasion of personal privacy." In sum, *Robbins'* focus on the singular "an" in the phrase "an unwarranted invasion of personal privacy" is not a sufficient reason to hold that Exemption 7(C) requires ad hoc balancing.

Third: In *FTC* v. *Grolier Inc.*, 462 U. S. 19 (1983), we also supported categorical balancing. Respondent sought FTC documents concerning an investigation of a subsidiary. At issue were seven documents that would normally be exempt from disclosure under Exemption 5, which protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U. S. C. § 552(b)(5). The Court of Appeals held that four of the documents "could not be withheld on the basis of the work-product rule unless the Commission could show that 'litigation related to the terminated action exists or potentially exists.'" 462 U. S., at 22. We reversed, concluding that even if in some instances civil-discovery rules would permit such disclosure, "[s]uch materials are . . . not 'routinely' or 'normally' available to parties in litigation and hence are exempt under Exemption 5." *Id.*, at 27. We added that "[t]his result, *by establishing a discrete category of exempt information,* implements the congressional intent to provide 'workable' rules. . . . Only by construing the Exemption to provide a categorical rule can the Act's purpose of expediting disclosure by means of workable rules be furthered." *Id.*, at 27–28 (emphasis added).

Finally: The privacy interest in maintaining the practical obscurity of rap-sheet information will always be high. When the subject of such a rap sheet is a private citizen and when the information is in the Government's control as a compilation, rather than as a record of "what the Government is up to," the privacy interest protected by Exemption 7(C) is in fact at its apex while the FOIA-based public interest in disclosure is at its nadir. See Parts IV and V, *supra*. Such a disparity on the scales of justice holds for a class of cases without regard to individual circumstances; the standard virtues of bright-line rules are thus present, and the difficulties attendant to ad hoc adjudication may be avoided. Accordingly, we hold as a categorical matter that a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, and that when the request seeks no "official information" about a Government agency, but merely records that the Government happens to be storing, the invasion of privacy is "unwarranted." The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN joins, concurring in the judgment.

I concur in the result the Court reaches in this case, but I cannot follow the route the Court takes to reach that result. In other words, the Court's use of "categorical balancing" under Exemption 7(C), I think, is not basically sound. Such a bright-line rule obviously has its appeal, but I wonder whether it would not run aground on occasion, such as in a situation where a rap sheet discloses a congressional candidate's conviction of tax fraud five years before. Surely, the FBI's disclosure of that information could not "reasonably be expected" to constitute an invasion of personal privacy, much less an unwarranted invasion, inasmuch as the candidate relinquished any interest in preventing the dissemination of this information when he chose to run for Congress.

In short, I do not believe that Exemption 7(C)'s language and its legislative history, or the case law, support interpreting that provision as exempting *all* rap-sheet information from the FOIA's disclosure requirements. See H. R. Rep. No. 1497, 89th Cong., 2d Sess., 11 (1966); S. Rep. No. 813, 89th Cong., 1st Sess., 3, 9 (1965); *Department of Air Force* v. *Rose,* 425 U. S. 352, 372 (1976); *Lesar* v. *United States Dept. of Justice,* 204 U. S. App. D. C. 200, 214, n. 80, 636 F. 2d 472, 486, n. 80 (1980).

It might be possible to mount a substantial argument in favor of interpreting Exemption 3 and 28 U. S. C. § 534 as exempting all rap-sheet information from the FOIA, especially in the light of the presence of the three post-FOIA enactments the Court mentions, *ante,* at 753. But the federal parties before this Court have abandoned the Exemption 3 issue they presented to the Court of Appeals and lost, and it perhaps would be inappropriate for us to pursue an inquiry along this line in the present case.

For these reasons, I would not adopt the Court's bright-line approach but would leave the door open for the disclosure of rap-sheet information in some circumstances. Nonetheless, even a more flexible balancing approach would still require reversing the Court of Appeals in this case. I, therefore, concur in the judgment, but do not join the Court's opinion.