**Supreme Court**

No. 2014-182-Appeal.
(PC 12-5458)

The Providence Journal Company et al.   :

v.   :

The Rhode Island Department of Public   :
Safety, by and through Peter Kilmartin,
Attorney General et al.

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

The Providence Journal Company et al.   :

v.   :

The Rhode Island Department of Public   :
Safety, by and through Peter Kilmartin,
Attorney General et al.

Present:  Suttell, C.J., Goldberg, Flaherty, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.**  The Providence Journal Company and Amanda Milkovits (collectively, the Journal or plaintiffs), seek review of an order granting summary judgment entered against them and in favor of the Rhode Island Department of Public Safety, the Rhode Island State Police, and Steven G. O'Donnell, in his capacity as the Commissioner of the Rhode Island Department of Public Safety and Superintendent of the Rhode Island State Police (collectively, defendants).  The Journal filed suit in Providence County Superior Court alleging violations of Rhode Island's Access to Public Records Act (APRA), G.L. 1956 chapter 2 of title 38, after they unsuccessfully requested records from the Rhode Island State Police concerning an investigation of an underage drinking incident at property owned by the then-Governor, Lincoln Chafee.  On appeal, the Journal takes issue with the Superior Court's determination that the requested documents are not subject to public disclosure pursuant to the APRA.  After careful consideration of the submitted memoranda and oral arguments, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

The travel of the case is easily sketched. On May 28, 2012, Caleb Chafee (Caleb), the son of then-Governor Lincoln Chafee, hosted a party on property owned by the then-Governor, during which some underage attendees consumed alcohol. At some point, an underage female left the party and, shortly thereafter, she was taken to a local hospital for alcohol-related illness. As a result, the Rhode Island State Police went to the property[1] to conduct an investigation. This investigation resulted in the compilation of 186 pages of investigative documents, including witness lists, witness statements, land evidence records, and narrative reports written by various officers (collectively, the requested records). At the conclusion of the investigation, Caleb was charged with the furnishing or procurement of alcoholic beverages for underage persons in violation of G.L. 1956 § 3-8-11.1, to which he pled nolo contendere in Rhode Island District Court on August 22, 2012, and received a $500 civil penalty. On March 13, 2013, a judge of the District Court granted Caleb's motion to expunge his record.

However, Caleb's liability was not the only product of the police investigation. In an effort to gather further information about the incident, on June 21, 2012, Amanda Milkovits (Milkovits), a reporter for the Providence Journal Company, sent an email to Colonel Steven G. O'Donnell (Col. O'Donnell), in which she "request[ed] copies of state police reports regarding the May 28 incident involving Caleb Chafee." This email further stated: "This is a public report, regarding the responses and actions of public employees. It's in the public interest to know how the situation was handled regarding the governor's son—especially since the state

---

[1] The property at which the party occurred is located in Exeter, Rhode Island. It is notable that the Rhode Island State Police responded because the Town of Exeter does not maintain its own police force.

police answer directly to the governor. This is a matter of transparency." In a letter dated June 25, 2012, the Rhode Island Department of Public Safety (the department) denied Milkovits' request for access to the documents. The purported reason for the denial was two-fold: (i) "the requested records [were] exempt from disclosure at [that] time, due to an ongoing criminal investigation and/or prosecution"; and (ii) the records "could reasonably be expected to be an unwarranted invasion of personal privacy * * *."

At some point, a state trooper revealed redacted copies of at least three of the requested records to a WPRO radio talk show host.[2] Apparently, this information suggested that Caleb demanded that the underage female who was treated for alcohol-related illness be removed from the premises and requested that no one call 911 until she was well away from the property.

On August 21, 2012, Milkovits sent another email to Col. O'Donnell in which she stated that she was "following up on the charging of Caleb Chafee in the Memorial Day party." Milkovits further indicated that "now that he's being charged, I'd like a copy of the report." In a letter dated August 29, 2012, the department again denied her request. As a reason for its denial, the department provided that the requested records "are not considered public records under Rhode Island law [because] * * * Rhode Island General Law § 38-2-2 excludes records identifiable to an individual in any files and law enforcement records, the disclosure of which could reasonably be expected to be an unwarranted invasion of personal privacy." This letter also contained the following language: "[E]nclosed please find a copy of the summons issued in this matter, as well as the violation complaint as filed with the Rhode Island District Court. These records have been entered into the District Court file and are therefore publicly available."

---

[2] This state trooper was charged administratively for revealing the material.

By letter dated September 5, 2012, the Journal requested that the department reconsider its denial of the records request.[3] On September 10, 2012, the department stated that it had reconsidered its initial denial as requested, but its position had not changed; thus, it denied the Journal's request for the same reasons as provided in its letter dated August 29, 2012. On September 24, 2012, the Journal filed an appeal with Col. O'Donnell pursuant to § 38-2-8, which was also denied.

Finding no relief through this preliminary out-of-court skirmishing, on October 22, 2012, the Journal filed a complaint in Providence County Superior Court, alleging violations of, inter alia, the APRA, the United States Constitution, and the Rhode Island Constitution. On March 5, 2013, pursuant to the Journal's request, defendants provided the Journal with a Vaughn index[4] of each item withheld by the government.

In due course, the parties filed cross-motions for summary judgment. In the Journal's motion, it argued that summary judgment should be granted because it was entitled to the requested records pursuant to the APRA. In response, defendants argued that public disclosure of the requested records would be inconsistent with the District Court's expungement order in Caleb's case. The defendants also argued that the records were exempt from public disclosure pursuant to the APRA, which deems not to be public "[a]ll records maintained by law enforcement agencies for criminal law enforcement and all records relating to the detection and

---

[3] In addition, this letter provided that it was to serve as "a new request, this time under the recently amended [APRA] * * *, which became effective September 1, 2012, for all records relating to Caleb Chafee * * * and the investigation which arose from occurrences at his home on May 28, 2012 * * *." Before us, both parties in their arguments rely on the APRA as amended in 2012.

[4] A "Vaughn index" is "[a] comprehensive list of all documents that the government wants to shield from disclosure in Freedom of Information Act (FOIA) litigation, each document being accompanied by a statement of justification for nondisclosure." Black's Law Dictionary 1788 (10th ed. 2014). In the case at hand, the index contained a description of each withheld record and the number of pages contained in each item.

investigation of crime, * * * [where] the disclosure of the records or information * * * could reasonably be expected to constitute an unwarranted invasion of personal privacy[.]" Section 38-2-2(4)(D), as amended by P.L. 2012, ch. 482, § 1.

After conducting an in camera review of the documents, analyzing memoranda submitted by the parties, and hearing oral arguments, the hearing justice determined that the order of expungement in Caleb's case did not prevent the Journal from accessing the records if allowable under the APRA. However, the hearing justice determined that the Journal had failed to "demonstrate[] a belief by a reasonable person that alleged government impropriety might have occurred." In addition, he determined that "disclosure would not advance the public interest" and "that the records are not reasonably segregable" because the documents make plain, even if redacted, that it was Caleb's event that was being investigated. Accordingly, he granted summary judgment in favor of defendants and denied that of the Journal. The Journal timely appealed.

## II

### Standard of Review

Our standard of review in this case is multifaceted. This Court's review of the grant of a motion for summary judgment is familiar and well-settled: We review such a grant de novo, "apply[ing] the same standards and rules as did the motion justice." Symonds ex rel. Symonds v. City of Pawtucket, 126 A.3d 421, 424 (R.I. 2015) (quoting Narragansett Indian Tribe v. State, 81 A.3d 1106, 1109 (R.I. 2014)). In so doing, "[w]e view the evidence in the light most favorable to the nonmoving party." Id. (quoting Narragansett Indian Tribe, 81 A.3d at 1109). "Summary judgment is appropriate when no genuine issue of material fact is evident from the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any,

and the motion justice finds that the moving party is entitled to prevail as a matter of law." Beacon Mutual Insurance Co. v. Spino Brothers Inc., 11 A.3d 645, 648 (R.I. 2011) (quoting National Refrigeration, Inc. v. Travelers Indemnity Co. of America, 947 A.2d 906, 909 (R.I. 2008)).

Additionally, this Court conducts a de novo review of a trial justice's ruling concerning the interpretation of a statute. Twenty Eleven, LLC v. Botelho, 127 A.3d 897, 900 (R.I. 2015). "In matters of statutory interpretation our ultimate goal is to give effect to the purpose of the act as intended by the Legislature." Webster v. Perrotta, 774 A.2d 68, 75 (R.I. 2001). "[W]hen the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." Swain v. Estate of Tyre ex rel. Reilly, 57 A.3d 283, 288 (R.I. 2012) (quoting Waterman v. Caprio, 983 A.2d 841, 844 (R.I. 2009)). In so doing, however, "[we] will not construe a statute to reach an absurd result." Id. at 289 (quoting Long v. Dell, Inc., 984 A.2d 1074, 1081 (R.I. 2009)). "Further, '[a] statute * * * may not be construed in a way that would * * * defeat the underlying purpose of the enactment.'" Id. (quoting Brennan v. Kirby, 529 A.2d 633, 637 (R.I. 1987)).

However, a trial justice's determination in balancing the public interest in disclosure against the privacy interests at stake presents a mixed question of law and fact, and we accord such questions the same amount of deference that we provide to a trial justice's findings of fact. See Direct Action for Rights and Equality v. Gannon, 819 A.2d 651, 662 (R.I. 2003). "[W]e will not overturn a trial justice's findings of fact absent a showing that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong." Id.

- 6 -

## Discussion

In 1979, the General Assembly enacted the APRA in recognition that "[t]he public's right to access to public records and the individual's right to dignity and privacy are both * * * principles of the utmost importance in a free society." Section 38-2-1, as enacted by P.L. 1979, ch. 202, § 1. Thus, the General Assembly provided a two-fold function of the APRA: "The purpose of this chapter is to facilitate public access to public records. It is also the intent of this chapter to protect from disclosure information about particular individuals maintained in the files of public bodies when disclosure would constitute an unwarranted invasion of personal privacy." Id. In addition, "this Court has 'long recognized that the underlying policy of the APRA favors the free flow and disclosure of information to the public.'" In re New England Gas Co., 842 A.2d 545, 551 (R.I. 2004) (quoting Providence Journal Co. v. Sundlun, 616 A.2d 1131, 1134 (R.I. 1992)).

In recognition of these competing purposes, the General Assembly carefully defined, on the one hand, what is subject to public disclosure and, on the other, what is protected. See § 38-2-2. Specifically, to perform its purpose of "facilitat[ing] public access to public records[,]" the APRA pronounces a general rule of disclosure, providing:

> "Except as provided in § 38-2-2(4), all records maintained or kept on file by any public body, whether or not those records are required by any law or by any rule or regulation, shall be public records and every person or entity shall have the right to inspect and/or copy those records at such reasonable time as may be determined by the custodian thereof." Section 38-2-3(a).

However, the exception provided in § 38-2-2(4) serves to curtail this general rule of disclosure by defining "public records" to include only certain records. These limitations illustrate the

General Assembly's desire to "protect from disclosure information * * * when disclosure would constitute an unwarranted invasion of personal privacy."  Section 38-2-1.

Section 38-2-2(4) defines "public records," in pertinent part, as, "all documents, papers, letters, maps, books, tapes, photographs, films, sound recordings, magnetic or other tapes, electronic data processing records, computer stored data * * * or other material * * * made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency."  However, the provision continues by providing that certain records "shall not be deemed public."  Id.  Among those records deemed to not be public, are:

> "All records maintained by law enforcement agencies for criminal law enforcement and all records relating to the detection and investigation of crime, including those maintained on any individual or compiled in the course of a criminal investigation by any law enforcement agency.  Provided, however, such records shall not be deemed public only to the extent that the disclosure of the records or information * * * could reasonably be expected to constitute an unwarranted invasion of personal privacy[.]"  G.L. 1956 § 38-2-2(4)(D)(c).

It is this provision—exempting from disclosure records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy," id.—that forms the basis of this appeal.[5]

Because the APRA mirrors the Freedom of Information Act (FOIA), 5 U.S.C. § 552, we look to federal case law interpreting FOIA to assist in our interpretation of the APRA.  See, e.g., In re New England Gas Co., 842 A.2d at 551.  Like the APRA, the FOIA provides for public

---

[5] In an effort to avoid the interpretation of the APRA entirely, the state contends that the fact Caleb's records were expunged precludes their disclosure under the APRA.  Specifically, the state cites to G.L. 1956 chapter 1.3 of title 12, the general "Expungement of Criminal Records" statute, which provides that, "[w]henever the records of any conviction and/or probation of an individual for the commission of a crime have been expunged under the provisions of this chapter, any custodian of the records of conviction relating to that crime shall not disclose the existence of the records upon inquiry from any source * * *," subject to certain exceptions not applicable here.  Section 12-1.3-4(c).  However, it is unclear whether Caleb's expungement was granted under chapter 1.3 of title 12, or, rather, pursuant to another statute.  Because we conclude that the records should not be disclosed in accordance with the APRA and that Caleb's privacy interest is sufficient to preclude disclosure without consideration of the expungement, we need not determine the effect of the expungement on the records at issue.

disclosure of records unless those records fall within one or more of the several exemptions. See National Archives and Records Administration v. Favish, 541 U.S. 157, 160 (2004). One such exemption, 5 U.S.C. § 552(b)(7)(C), "excuses from disclosure 'records or information compiled for law enforcement purposes' if their production 'could reasonably be expected to constitute an unwarranted invasion of personal privacy.'" Favish, 541 U.S. at 160 (quoting 5 U.S.C. § 552(b)(7)(C)).

In Favish, 541 U.S. at 171-75, the United States Supreme Court considered the applicability of this exemption to certain photographs depicting the condition of a decedent's body at the scene of death. In so doing, the Court stated that "[t]he term 'unwarranted' requires us to balance the * * * privacy interest against the public interest in disclosure." Id. at 171. To effectuate this balance, the Court provided a two-step process by which a citizen must prove that it is entitled to disclosure of the records. Specifically, it provided that: "First, the citizen must show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake. Second, the citizen must show the information is likely to advance that interest. Otherwise, the invasion of privacy is unwarranted." Id. at 172. In our opinion, the framework that the Supreme Court sets forth in Favish is sound; thus, we follow this example and adopt this scheme in our interpretation of the APRA.

As a threshold matter, we address the Journal's contention that this Court's adoption of the interpretation of the FOIA in Favish would displace the burden that the APRA places upon the public body to demonstrate that "the record in dispute can be properly withheld from public inspection." Section 38-2-10. What the Journal fails to recognize in making this argument is that the FOIA contains a nearly identical statutory provision. See 5 U.S.C. § 552(a)(4)(B) (granting the district court "jurisdiction to enjoin the agency from withholding agency records

and to order the production of any agency records improperly withheld from the complainant * * * and the burden is on the agency to sustain its action"). In Favish, 541 U.S. at 172, the Supreme Court observed that "[t]o effect [the balance of privacy interest against the public interest in disclosure] and to give practical meaning to the exemption, the usual rule that the citizen need not offer a reason for requesting the information must be inapplicable." We agree, and so we place the same gloss upon the APRA.

We now proceed to the thrust of the Journal's appeal. Here, the Journal seeks the investigatory files related to the facts underlying the charge of a private individual in hopes of potentially uncovering some hint of impropriety. Like Favish, where the Court dealt with "photographic images and other data pertaining to an individual who died under mysterious circumstances," the justification most likely to satisfy the APRA's public interest requirement "is that the information is necessary to show the investigative agency or other responsible officials acted negligently or otherwise improperly in the performance of their duties." Favish, 541 U.S. at 173. Of course, this standard would be toothless if disclosure were required based upon mere speculation, without the need to provide some evidence of negligence or impropriety. See id. at 174. Thus, we hold, in line with Favish, that:

> "[W]here there is a privacy interest protected by [G.L. 1956 § 38-2-2(4)(D)(c)] and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." Favish, 541 U.S. at 174.

Before assessing whether the Journal presented any such evidence in this case, we pause to address the Journal's contention that the standard presented in Favish, 541 U.S. at 174, is inapplicable to the case at hand. Specifically, it contends that this "governmental impropriety"

standard should apply only when the sole alleged public interest is government impropriety. <u>See Citizens for Responsibility and Ethics in Washington v. United States Department of Justice</u>, 746 F.3d 1082, 1095 & n.5 (D.C. Cir. 2014) (declining to apply the standard announced in <u>Favish</u> where no impropriety was alleged on the part of the FBI or the DOJ). It then asserts that it alleged <u>two</u> public interests in the case at hand: (i) discovering potential government impropriety; and (ii) disclosing to the public how the State Police investigated the Governor under the circumstances. For our purposes, however, this is a distinction without a difference: the Journal's second alleged public interest amounts to nothing more than another way of describing the first. Put another way, the information that the Journal hopes to uncover under its second asserted public interest is, in fact, government impropriety. Thus, to accept the Journal's argument that there are two public interests in the case at hand would allow parties to avoid the <u>Favish</u> standard merely by exercising creative semantics. We decline this invitation. We do not, however, foreclose the possibility that the <u>Favish</u> standard may be inapplicable where a party asserts an authentic secondary public interest.[6]

---

[6] The Journal also contends that the public interest was increased by (i) "the fact that the State Police were investigating a possible violation of such an important law [(the Social Host Law)]"; and (ii) "the close relationship under Rhode Island law between the State Police, the Governor, and his family * * *." With regard to the public interest in viewing the implementation of the Social Host Law, the Journal's argument is unavailing. Any information provided by the investigatory documents in this isolated incident would provide facts in relation to just that—a single incident. The documents would not provide the public with any indication of how this law is enforced generally. <u>See Hunt v. Federal Bureau of Investigation</u>, 972 F.2d 286, 288-89 (9th Cir. 1992) (contrasting a FOIA request for a single investigatory file with requests for numerous disciplinary files and concluding that "[t]he single file * * * will not shed any light on whether all such FBI investigations are comprehensive"). With regard to the close relationship between the Governor and the State Police, we note that this appears to be yet another circuitous way of describing the "government impropriety" public interest. That is, the public interest in the contents of the investigatory documents would flow from whether the State Police adequately investigated the then-Governor, or whether corners were cut. Further, such a relationship between the Governor and the State Police will be present in any investigation or interaction involving the two. Thus, if we were to allow this relationship to rise to the level of a significant

- 11 -

We now turn our analysis to whether the Journal has presented evidence that "the information is necessary to show the investigative agency or other responsible officials acted negligently or otherwise improperly in the performance of their duties." Favish, 541 U.S. at 173. In conducting our review, we remain mindful that "there is a presumption of legitimacy accorded to the Government's official conduct * * * [and] where the presumption is applicable, clear evidence is usually required to displace it." Id. at 174. Even without the disclosure of the contents of the sought after records, it is clear that the State Police performed a comprehensive investigation of Caleb's violation of the Social Host Law. Indeed, the volume of records requested under the APRA illustrates that a thorough investigation was performed. The Vaughn index (which was provided to the Journal) indicates that the investigation resulted in the compilation of 186 pages of documents, including at least eighteen witness statements, seven narrative documents from members of the State Police, incident reports, and land evidence records. In addition, the investigation resulted in charging Caleb under the Social Host Law. The Journal has not pointed to a shred of evidence to suggest that "the investigative agency or other responsible officials acted negligently or otherwise improperly," id. at 173, other than to speculate as to the mere possibility that some venality or irregularity may have occurred in the investigation due to the then-Governor's position. When the release of sensitive personal information is at stake and the alleged public interest is rooted in government wrongdoing, we do not deal in potentialities—rather, the seeker of information must provide some evidence that government negligence or impropriety was afoot. Because the Journal failed to provide any such evidence, the public interest can, at best, be characterized merely as an uncorroborated

public interest without proof of some impropriety, then nearly every investigation by the State Police involving the Governor would be subject to disclosure as a matter of course. We decline to give the mere presence of a relationship such a pervasive effect.

- 12 -

possibility of governmental negligence or impropriety. Such a tenuous "public interest" is insufficient to mandate disclosure under the Favish standard that we today adopt and thereby imbue upon the APRA.

While we conclude that the Journal failed to satisfy the Favish standard, we nonetheless continue our analysis (for the sake of completeness and to provide future guidance) to weigh the seemingly negligible public interests asserted by the Journal against the privacy interests at stake. The parties vigorously dispute the proper valuation of the privacy interests in this case. The Journal contends that (i) Caleb's privacy interest was substantially diminished because of the publicity that the incident received in the media and because he pled nolo contendere to violating the Social Host Law; (ii) the then-Governor's privacy interest was de minimis because his "status as a public official operates to reduce his cognizable interest in privacy" (quoting Citizens for Responsibility and Ethics in Washington v. United States Department of Justice, 846 F. Supp. 2d 63, 71 (D.D.C. 2012)); and (iii) the identities of third-persons who provided witness statements were "reasonably segregable" and, thus, could be redacted to prevent any invasion of privacy.[7]

Turning first to Caleb, we place little stock in the Journal's contention that his privacy interest was significantly diminished because of the publicity that his charge for violating the Social Host Law received. Notably, a copy of the summons and complaint were produced to the Journal, which confirmed the existence of a charge against him. While the media coverage may have made known to the public the existence of the charge, it certainly did not reveal the intimate details underlying the charge. The privacy interest at stake flows not from the widespread knowledge of the fact that Caleb was charged, but, instead, from the information and personal

---

[7] Both parties agree that the third-party identities could be redacted and, thus, none of their privacy interests are implicated by disclosure of the records. Accordingly, we do not consider the third-party privacy interests for purposes of our analysis.

details that may have been discovered in the police investigation. Moreover, while the charge was, in fact, public, "the fact that 'an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information.'" United States Department of Justice v. Reporters Commission For Freedom of Press, 489 U.S. 749, 770 (1989) (quoting Rehnquist, Is an Expanded Right of Privacy Consistent with Fair and Effective Law Enforcement?, Nelson Timothy Stephens Lectures, University of Kansas Law School, pt. 1, p. 13 (Sept. 26-27, 1974)). Therefore, we find the Journal's argument in this regard unconvincing.

Similarly, we see no merit with regard to the Journal's contention that Caleb is entitled to lesser privacy because he pled nolo contendere to violating the Social Host Law. While the plea might lessen the privacy extended to the conviction, it does not do so with respect to the facts underlying it. Indeed, in American Civil Liberties Union v. United States Department of Justice, 655 F.3d 1, 7 (D.C. Cir. 2011), on which the Journal relies, the D.C. Circuit Court of Appeals provided "that the disclosure of convictions and public pleas is at the lower end of the privacy spectrum." However, the court in that case was dealing with only the disclosure of the fact of conviction, not the facts underlying the conviction or information provided in the investigation of the crime. See id. at 8 ("It would disclose only information concerning a conviction or plea; it would not disclose mere charges or arrests. It would disclose only information that has already been the subject of a public proceeding (either a trial or public guilty plea), rather than actions (like arrests) that may not have taken place in public."). Thus, the Journal's argument that Caleb's privacy interest in the police investigative documents was diminished because he pled nolo contendere also lacks force.[8]

---

[8] In addition, we note that the distinction between the existence of a plea and the facts underlying the charges that gave rise to such a plea is further supported by practicality: it is a common

- 14 -

In the case of the documents developed by law enforcement in the investigation of a private individual, the privacy interest is considerable and should not be easily displaced absent a particularly noteworthy public interest. See Reporters Commission for Freedom of Press, 489 U.S. at 769, 771 ("We have * * * recognized the privacy interest in keeping personal facts away from the public eye. * * * The privacy interest in a rap sheet is substantial."). As such, we are satisfied that Caleb's privacy interest is significant,[9] and, consequently, we cannot allow the Journal's unsubstantiated assertion—pointing to the mere possibility that government impropriety occurred in the investigation due to the then-Governor's position—to mandate disclosure of sensitive information.[10] Accordingly, we cannot conclude "that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong," Direct Action for Rights and Equality, 819 A.2d at 662, in his balancing of Caleb's privacy interest against the public interests at issue.

At oral argument, the Journal posed the following question: "[I]s there a good reason the people shouldn't see what the state police did?" We answer that question in the affirmative. Pursuant to the APRA, records need not be disclosed where such disclosure could create an unwarranted invasion of privacy—here, Caleb's privacy interest created a barrier that the public interests in disclosure as asserted by the Journal could not overcome.

---

tactical move for a defendant to plead guilty or nolo contendere rather than take his chances in court, to avoid the exposure of unfavorable facts during a public trial.

[9] In view of Caleb's considerable privacy interest that would be compromised if the investigative documents were released, we need not pin down the exact valuation of the privacy interest of the then-Governor. That is, a disclosure of the records would constitute an unwarranted invasion of Caleb's privacy; thus, the records may be withheld under the APRA regardless of the privacy interests of the then-Governor.

[10] We note that redaction would be ineffective to reduce Caleb's privacy interest in this case. Given the media attention that the investigation of Caleb has received from its onset, the subject of any records would be abundantly clear, even if redacted.

## IV

## Conclusion

For the reasons set forth above, we affirm the judgment of the Superior Court. The materials associated with this case may be remanded to that tribunal.

Justice Robinson did not participate.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:** The Providence Journal Company et al. v. The Rhode Island Department of Public Safety, by and through Peter Kilmartin, Attorney General et al.

**CASE NO:** No. 2014-182-Appeal.
(PC 12-5458)

**COURT:** Supreme Court

**DATE OPINION FILED:** April 11, 2016

**JUSTICES:** Suttell, C.J., Goldberg, Flaherty, and Indeglia, JJ.

**WRITTEN BY:** Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:** Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice William E. Carnes, Jr.

**ATTORNEYS ON APPEAL:**

For Plaintiffs: Joseph V. Cavanagh, Jr., Esq.
Mary C. Dunn, Esq.
Robert J. Cavanagh, Jr., Esq.

For Defendants: Michael W. Field
Lisa Pinsonneault
Malena Lopez Mora
Department of Attorney General